[No. B069504. Second Dist., Div. Four. Jan. 5, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
GERSHON HEPNER et al., Defendants and Appellants.

[No. B079058. Second Dist., Div. Four. Jan. 5, 1994.]

In re GERSHON HEPNER on Habeas Corpus.

## COUNSEL

Robert S. Gerstein and Suzanne H. Paboojian, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## RAPPE, J.*—

### INTRODUCTION

Appellants, Gershon Hepner, M.D., and Cheryl Ann Spinner, appeal from judgments of conviction after the denial of their motions to suppress evidence and their resulting guilty pleas to various felony charges arising from a widespread insurance fraud related to Dr. Hepner's medical practice. (Pen. Code, § 1538.5, subd. (m).) The trial court imposed on Dr. Hepner a total prison sentence of eight years, four months, $70,000 in fines, and $210,868 in restitution. Based on the parties' stipulation that Dr. Hepner had served 135 actual days in custody, the court calculated conduct credits of 67 days for a total of 202 days total custody credits. As to Spinner, the court suspended prison sentences, placed her on probation conditioned on serving 365 days in county jail, imposed $15,000 in fines, and ordered $8,466 in restitution. There were no custody credits.

### PROCEDURAL BACKGROUND

On April 9, 1991, the trial court denied appellants' motion to quash a search warrant used to search Dr. Hepner's office located at 2080 Century Park East, suite 903, Los Angeles, California.

On September 5, 1991, the trial court denied appellants' motion to traverse the affidavit supporting the search warrant.

On January 29, 1992, the trial court denied appellants' motion to reconsider the earlier rulings.

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

On March 12, 1992, the trial court denied appellants' motion to reconsider the motion to traverse the warrant on the basis of newly discovered evidence, namely Patricia Bates's testimony she did not recall giving the affiant a 90 percent fraud estimate.

FACTS

1. *The Motion to Quash the Search Warrant*

   a. *The Search Warrant and Affidavit*

The parties agreed the challenged search warrant permitted the seizure of all patient files in Dr. Hepner's Century City office. The parties also agreed about the specificity with which the property in the search warrant was described. However, they disagreed about whether the affidavit, attached and incorporated by reference into the search warrant, set forth sufficient probable cause for the broad description.

On June 7, 1989, Lon Malcolm, a senior criminal investigator with the California Department of Insurance, Bureau of Fraudulent Claims since June 1, 1987, prepared and submitted the affidavit in support of the search warrant. Malcolm had had previous law enforcement experience of about 10 years, during which he had dealt with fraudulent insurance claims, including medical fraud.

In his affidavit, Malcolm stated Dr. Hepner "is a Gastroenterologist by specialty, however, the bulk of his practice is dedicated to personal injury." In addition to the Century City office, Dr. Hepner had offices "in Inglewood, Hollywood and Studio City." However, the records for all four offices were maintained in the Century City office.

Malcolm stated former and current employees had informed him that Dr. Hepner was "engaged in extensive, systematic insurance fraud in concert with many of his employees, patients, and various attorneys" and that he "bill[ed] insurance carriers for millions of dollars for services not actually rendered." Malcolm was investigating "allegations of Grand Theft, Tax Evasion, Insurance Fraud, and Conspiracy to Defraud."

Malcolm set forth information received from the following people who had worked for Dr. Hepner in his Century City medical office: (1) Rebecca Marble, a physical therapy aide; (2) Patricia Bates, a physical therapy aide; (3) Dolores Williams; (4) Elise Vasta, a physical therapist; (5) Antoinette Meier; (6) Holiday Jackson, a massage therapist; (7) Myriana Orenstein, a

registered physical therapist; (8) Caty Van Houten, a physical therapy aide; (9) Linda Cunningham, an employee in the billing section; and (10) Melia Workman, a receptionist. Cunningham and Workman received "limited immunity from prosecution."

The affidavit set forth widespread fraudulent practices directed by Dr. Hepner. Dr. Hepner paid a number of his employees, including Marble, Cunningham, Workman and others, a significant portion of their salary "under the table" in cash. He also defrauded patients' insurance carriers. For example, Jackson had explained to Malcolm "four different fraudulent methods to generate income from insurance carriers. [Dr. Hepner] would bill for: 1) patients who had been in fictitious accidents; 2) patients who had been in accidents but were not injured; 3) over treatment of legitimately injured patients; 4) inappropriate treatment of legitimately injured patients."

According to Marble, Orenstein, Van Houten and Workman, in order to generate patients, "[m]any of [whom were] not injured or ill," for this scheme, Dr. Hepner paid cash referral fees as large as $500 to employees, attorneys, patients and others. As to patients with some injury, according to Jackson, Dr. Hepner "made it clear that if patients were feeling good, the massage therapists were not to indicate that fact on the chart." Dr. Hepner "encouraged the massage therapists to falsify the chart notes to keep patients in treatment longer."

Marble, Bates, Williams, Vasta, Meier, Jackson, Orenstein, Van Houten, Cunningham and Workman indicated Dr. Hepner and his employees had "patients" enter multiple signatures on sheets of paper listing numerous dates to which office employees later added false treatment notes documenting supposedly necessary long term therapy. The false entries were used to support fraudulent insurance claims based on "bogus office visits and treatments."

For example, Bates stated "patients" were "instructed to sign their names 15 to 20 times on a blank piece of paper whether they received any treatment or not." Samples of these lists, provided by Bates, were attached to the affidavit. Bates also revealed "that front office personnel [were] instructed to randomly assign an asterisk to patient date and signature entries. This [became] a flag to billing personnel . . . to charge an additional fee for that particular treatment." Marble, hired in May 1986, indicated "[p]hony treatment notes would then be entered next to each date and signature." Marble "observe[d] many of these patients repeating this process frequently." Williams, who worked for Dr. Hepner from April 1984 to May 1985, agreed that "insurance carriers were 'constantly' being billed for office visits that had

not taken place." She noted "patients were instructed to sign their names next to long lists of random dates." Vasta, who worked for Dr. Hepner from September 1986 through the date of the search warrant, "admitted that she had on occasion filled out false treatment notes on patients' charts" until May 1987 when she and some others refused to cooperate any longer. Meier said Dr. Hepner "asked her to fill out 'stacks and stacks' of phony treatment notes that patients had already signed." Van Houton, hired in December 1987 and still employed in May 1989, indicated Dr. Hepner "personally writes in the multiple treatment dates in the patients' charts and has the patient sign next to each date without the benefit of receiving the purported treatment." Cunningham, who worked for Dr. Hepner from June 1985 until June 1987, indicated Dr. Hepner "personally instructed [her] to enter random dates on patients' medical charts. She would write 'pages' of dates for patients to sign, being careful to leave room for phony treatment notes to be added later. [Dr. Hepner] told her to be sure that the random dates did not include weekends or holidays. In addition . . . , [Dr. Hepner] had Miss Cunningham routinely add false treatments. [Dr. Hepner] reviewed all bills before they were sent out to insurance carriers or attorneys. Frequently, [Dr. Hepner] would return a bill to Miss Cunningham telling her to 'make the bill bigger.' She would then randomly add dates of treatment and false services. [Dr. Hepner] would then add those dates to the 'History Physical Evaluation Form.'" Workman, who worked for Dr. Hepner from January 1986 until September 1987, indicated that within one month of starting to work in the office, Dr. Hepner "began to have her write in treatment notes in patients' medical charts." At first, Dr. Hepner "would personally hand her a few charts at a time and would instruct her to write specific treatments in the charts, such as: Heat, Ultrasound and Massage (written as 'HUM' on the charts.) These notes would be written in just underneath the patients' signatures which were entered previously by the patients themselves next to random dates written in by [Dr. Hepner] and his employees. Miss Workman had seen [Dr. Hepner] and his employees writing in these random dates. [¶] After a month or so of this, [Dr. Hepner] left her on her own to enter in random treatment notes onto patient charts that [Dr. Hepner] continued to give her on an ongoing basis. [Dr. Hepner] would often check her work and make comments such as 'use different colored pens' or 'use different styles of writing.'" Workman "stated that she wrote fake treatment notes in literally thousands of patients' medical charts."

Meier, Cunningham and Workman related instances where they personally were involved with Dr. Hepner in fraudulent insurance submissions. Meier "was herself in an accident for which she never received any medical treatment" yet Dr. Hepner "billed her insurance company." Cunningham related that Dr. Hepner "fabricated an accident that predated [her] mother's

death. A claim was then submitted to an insurance carrier for services never rendered. The $2,500 received from this claim was divided between the suspect and the witness." Cunningham also admitted referring uninjured friends to Dr. Hepner, who "then fabricated injuries and treatments and submitted claims to insurance carriers. [Dr. Hepner] split the money with [Cunningham's] friends." In addition, when Cunningham was a patient of Dr. Hepner in May 1987, he billed her insurance company for X-rays and blood tests which were not provided. Finally, Workman explained she had been hospitalized in April 1987 and, although Dr. Hepner was not her attending physician, he fraudulently billed her insurance company for $4,759 for physical therapy visits, examination fees and tests which were not provided.

In order to illustrate the extent of this fraudulent scheme, Malcolm quoted Bates, Cunningham and Workman. "Miss Bates estimated that approximately 90% of the patients' cases contained fraudulent treatment notes." "According to Miss Cunningham, approximately 90% of all patient cases involved fraudulent actions on behalf of [Dr. Hepner]." "Miss Workman explained that [Dr. Hepner] perpetrated fraud on approximately 85-90% of patient cases."

In addition, Malcolm set forth information concerning blood testing channeled through Century Medical Laboratory. "According to Miss Workman, [Dr. Hepner] owns Century Medical Lab and uses it as a tool to defraud insurance carriers." Orenstein "stated that all patients that come into the clinic get a complete blood panel whether medically indicated or not. She stated that these blood panels are all processed through Century Medical Laboratory which [Dr. Hepner] owns." Cunningham corroborated this and added that "the patient's insurance carrier is billed approximately $640, though many of these tests are never performed."

Malcolm also related he had "received complaints of insurance fraud from several insurance carriers, including Blue Cross, Aetna, Cigna and Travelers. These carriers conducted investigations of their own by contacting various patients. . . . These patients stated that many of the treatments billed for were never rendered."

b.  *The Hearing Testimony of Investigator Malcolm*

On April 8, 1991, the trial court heard Malcolm's testimony concerning his training, his investigation, his preparation of the search warrant and the supporting affidavit, his dealings with the magistrate who issued the warrant, and his execution of the warrant.

In about 10 meetings, starting in March 1989, Malcolm worked with Deputy District Attorney Andrew Blum to prepare the search warrant and supporting affidavit. Although Dr. Hepner's employees had not mentioned the gastroenterological patients to Malcolm, he did not exclude them from the scope of the search because he and Blum "were concerned about presentation of false claims no matter what kind of accidents or maladies may have been."

Malcolm, accompanied by Blum, spent about 30 to 45 minutes with Judge Ringer who issued the search warrant. He provided Judge Ringer with copies of the fraudulent sign in sheets with no treatment notes provided by Bates. Judge Ringer questioned Malcolm to assure himself the 90 percent fraud representations in the affidavit were accurate. Malcolm understood the search warrant authorized seizure of all the patient files.

Although Malcolm had the names of 50 to 100 specific patients involved in Dr. Hepner's fraud, he sought all the patient files because he "was led to believe by a number of employees that Dr. Hepner was engaged in a continuing course of insurance fraud amounting to approximately 90 percent of his business." This involved both patients who "didn't receive treatment" and those whose "bills may have been padded."

After seizing the patient files, Malcolm found "90 percent" of them did contain evidence of fraud. Malcolm encountered files "that appeared not to have any problems." Interestingly, however, the 10 percent balance included "many files where there were more billings than sign-ins or treatments, maybe one or two more." Of the files seized, "maybe a half a percent" related to "patients that were treated for gastro[entero]logical problems."

c. *The Trial Court's Ruling*

The trial court found the warrant was overbroad but denied the motion to suppress on the basis that Malcolm acted in good faith under the doctrine of *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405]. As to the overbreadth ruling, the court first stated, "I don't find that the People's first theory, since any nine out of ten files would have contained evidence of criminal activity or felonious activity, that would justify seizing all of them." Also rejecting the People's theory that the breadth of the seizure was justified by the "permeated with fraud" doctrine, the court commented, "Here, by the prosecution's own evidence and by the contents of the affidavit, there was 10 percent of the activity at the medical office that was not of a criminal nature. [¶] And that would indicate that there was a situation that was not solely and exclusively a scheme to defraud. There was

at least 10 percent of the activity at that medical office that was not criminal." The court noted "there was, based upon the information contained in the affidavit, a very strong case to be made that the entire enterprise of Dr. Hepner was permeated with fraud."

## 2. The Motion to Traverse the Search Warrant

### a. Pleadings and Supporting Documentation

On May 13, 1991, appellants filed a motion to traverse the affidavit in support of the search warrant with regard to good faith challenging Malcolm's 90 percent representation to Judge Ringer at the time the search warrant was obtained. This motion was later supplemented by an offer of proof, based on reports and transcripts of interviews of witnesses by Malcolm, citing lower than 90 percent estimates by a number of witnesses.[1] The supplement also claimed staleness vitiated the probable cause showing because percentage estimates were lacking for 1984 and from September 1987 to June 1989. Also, in the Workman transcript, included in the offer of proof, she explained she and others had refused to continue their participation in the fraud following May 1987. The supplement next raised the omission of information in the affidavit that there was less fraud practiced in the Studio City, Hollywood and Inglewood offices. The supplement again raised the lack of direct evidence of fraud connected with the gastroenterological files. The supplement also questioned the Bates's 90 percent estimate because it was not referred to in Malcolm's notes. Finally, in the Cunningham and Workman interviews, included in the transcripts comprising appellants' offer of proof, were discussions of a coding system used by Dr. Hepner for his files. Further discussion of the contents of these interviews contained in the offer of proof follows where necessary to the resolution of the issues raised by appellants.[2]

The prosecution filed opposition on July 3, 1991, and September 4, 1991, in which it took the position that (1) some lower estimates did not relate to the percentage of fraud in the files; (2) files from satellite offices were handled in Century City where the prosecution's fraud figures prevailed; and

---

[1]Although the Attorney General initially disputed whether these reports were before the trial court to consider in making its ruling, we note that in ruling on the motion the court stated, "I reviewed those documents, and I agree with the prosecution that they really don't cut away from this 90 percent figure."

[2]Because of a dispute between the parties concerning the extent of interview materials before the trial court and our inability to resolve that dispute on the record before us, appellant Hepner has also filed a petition for a writ of habeas corpus raising ineffectiveness of trial counsel for failure to place a complete set of interviews transcripts before the trial court for its consideration. Because our decision would be the same whether or not these materials were before the trial court, we have set forth the facts as if they were considered below.

(3) the information was not stale because it related to a continuing fraud and witnesses Orenstein and Van Houten were still working with Dr. Hepner as late as May 1989.

b. *Testimony of Malcolm*

On September 5, 1991, the trial court heard the testimony of Malcolm. Malcolm explained he omitted the lower percentage estimates of some employees because they functioned in a limited phase of the operation and did not see what was going on in billing, as did Cunningham and Workman, for example, who possessed a broad overview of the fraud described. Malcolm explained "the fraud was so extensive in Dr. Hepner's office . . . I actually believed that just about every file we picked up would probably have evidence of fraud in it." He testified that his belief was that he could seize all the files under the "permeated with fraud" theory. He testified Judge Ringer, in issuing the warrant "was impressed with the magnitude as we were."

Malcolm testified he had received information about fraud committed in 1984. However, he had no percentage estimate for that year. He had percentage figures for 1988 and 1989 but they were lower than 90 percent because the figures came from employees with a limited perspective within the office. He admitted not explaining any change of operation after the refusal of some employees to continue participating in the fraud after May 1987. Malcolm explained, "I believe we didn't put it in because we found evidence he made statements after that revolt, if you don't do it, I will do it myself. [¶] There were other employees in the report that saw him continue that course of action after that revolt."

Malcolm explained that the satellite office patients files were included in the request because "most of the treatment, including the initial and concluding treatment, is Century City, that they received intervening treatment and interim treatment in the satellite offices if they were assigned to that office." In addition, "[a]ll the medical records were maintained in Century City." Malcolm explained persons in the satellite offices would not observe the fraudulent file activity in the Century City office.

Malcolm testified his request did not exclude the gastroenterological files because "[my] theory simply was that there was evidence that Dr. Hepner was padding bills. No matter what kind of files they were, if they went to insurance companies, there was the allegation and some supporting evidence that he was padding those bills as well." He emphasized, "And gastroenterology files are no different as far as insurance goes than personal injury." Malcolm stressed the evidence that Dr. Hepner "was padding his bills."

### c. *The Trial Court's Ruling*

Following argument by counsel, the court denied the motion.[3] The court found Malcolm's belief that probable cause supported the scope of the seizure was "reasonable." The court reiterated its earlier statement by noting its original decision on probable cause to support the breadth of the warrant "was a close issue." With respect to lower percentage estimates of some employees, the court found "those estimates were by people who, from the evidence that has been presented to me and the testimony of [the affiant], did not have the same [perspective] and the over all view of the activities in the office that would have given rise to the 90 percent figure that appeared in the affidavit." Finally, the court found "none of [the omissions or misstatements] would have had any material effect on the magistrate's finding that in this case there was probable cause to issue the warrant."

## 3. *The Motions to Reconsider the Earlier Denials*

### a. *The Motion to Reconsider Based on People v. Camarella*

Appellants moved for reconsideration of the earlier denials of the motions to quash the search warrant and to traverse the affidavit, based on the recently decided case of *People* v. *Camarella* (1991) 54 Cal.3d 592 [286 Cal.Rptr. 780, 818 P.2d 63]. Appellants did not support this motion with any additional evidence. On January 29, 1992, after argument of counsel, the court denied this motion.

### b. *The Motion to Reconsider Based on Newly Discovered Evidence*

Appellants moved to reconsider the previous rulings on the basis that "Patricia Bates, whom Malcolm quoted in his affidavit as estimating that 'approximately 90% of the patients' cases contained fraudulent treatment notes,' never made such an estimate, and never told Malcolm that she did."

The prosecution presented declarations from Bates and Malcolm. In her declaration, Bates stated she did not recall giving a percentage-of-files-containing-fraud estimate to Malcolm. She did recall having a telephonic interview with Malcolm sometime before their formal office interview. She also recalled having tape-recorded an undercover conversation with Cunningham in the summer of 1988. In his declaration, Malcolm stated that in

---

[3]With counsel's consent, the trial court indicated it would consider the hearing to be pursuant to *Franks* v. *Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 98 S.Ct. 2674] "for appellate purposes" in the alternative "assuming arguendo that this search warrant did have probable cause within it. . . ."

late July 1989 Bates telephonically informed him "that 90% of the cases handled by Hepner's office contained fraud in one form or another. I remember this because it was the first time I had heard such a large estimate relating to fraud on the part of a doctor." Malcolm also stated that Bates tape-recorded an undercover conversation with Cunningham on June 21, 1988, in which Malcolm "heard Cunningham state that just about every file in Hepner's operation was fraudulent." Attached to this declaration was a transcript of that conversation in which, in response to Bates's question about what charts had been faked, Cunningham stated, "Just about everyone of 'em . . . just about every single one of 'em."

At a hearing on March 12, 1992, Bates testified that although she had no present recollection of giving Malcolm a percentage estimate of fraud, she did admit it was "possible [she] gave a 90 percent estimate to Lon Malcolm at the beginning of the investigation." Malcolm testified Bates gave him the 90 percent fraud estimate during their initial telephone conversation. He also testified that he heard a tape recording of the June 21, 1988, meeting between Bates and Cunningham in which Cunningham stated "that just about every single file in Dr. Hepner's office was fake."

The trial court denied this motion, noting "it's an issue of credibility. . . ." The court explained, "I find that there was some mention of 90 percent in that phone call heard between Ms. Bates and Mr. Malcolm, that he did have that information and it was derived from the phone call with Ms. Bates."

## ANALYSIS

1. *Overbreadth of the Search Warrant*

a. *In General*

Appellants generally contend the trial court correctly found the search warrant for Dr. Hepner's office was overbroad.[4] The trial court found the search warrant was overbroad because the probable cause in the supporting affidavit failed to support such an extensive search, not because there was insufficient particularity in its description of the items to be seized. As stated in *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 250 [118 Cal.Rptr. 166, 529 P.2d 590]: "It is axiomatic that a warrant may not authorize a search broader than the facts supporting its issuance. [Citation.]" "Thus, the concept of breadth may be defined as the requirement that there

---

[4]Because we uphold the validity of the search warrant, it is unnecessary to address the Attorney General's contention that appellant Spinner lacked standing to challenge the search.

be probable cause to seize the particular thing named in the warrant." (*In re Grand Jury Subpoenas Dated Dec. 10, 1987* (9th Cir. 1991) 926 F.2d 847, 857.) This standard carries out the Fourth Amendment's prohibition on general warrants. The vice of a general warrant is that it permits " ' " "a general, exploratory rummaging in a person's belongings. . . . [Citation.]" ' " (*Andresen* v. *Maryland* (1976) 427 U.S. 463, 480 [49 L.Ed.2d 627, 642, 96 S.Ct. 2737].)

Generally speaking, "[t]he court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case. [Citations.]" (*People* v. *Rogers* (1986) 187 Cal.App.3d 1001, 1008 [232 Cal.Rptr. 294].) More particularly, Justice Kennedy, while a circuit judge, noted that courts dealing with issues of overbreadth "have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant [citations]; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not [citations]; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued [citations]." (*United States* v. *Spilotro* (9th Cir. 1986) 800 F.2d 959, 963-964; see also *United States* v. *Stubbs* (9th Cir. 1989) 873 F.2d 210, 211.) Appellants do not raise the second factor.

Appellants first contend the trial court correctly found the probable cause in the affidavit did not support the scope of the search warrant.[5] Next, appellants contend the search warrant was overbroad because, based on the affidavit and the evidence presented to traverse the warrant (including that in support of reconsideration of the issue), the description of items to be seized should have been limited so that it (1) did not extend beyond Dr. Hepner's "personal injury practice" to cover "the records of gastroenterological patients"; (2) did not extend beyond the "list of 50 to 100 files of specifically-named patients known to contain evidence of fraud" which was attached to

---

[5]In *United States* v. *Leon*, *supra*, 468 U.S. 897, as summarized in *People* v. *Camarella*, *supra*, 54 Cal.3d at page 596, the California Supreme Court "described four limited situations . . . in which suppression under the exclusionary rule would remain an appropriate remedy: (i) the issuing magistrate was misled by information that the officer knew or should have known was false; (ii) the magistrate 'wholly abandoned his judicial role'; (iii) the affidavit was ' "so lacking in indicia of probable cause" ' that it would be ' "entirely unreasonable" ' for an officer to believe such cause existed; and (iv) the warrant was so facially deficient that the executing officer could not reasonably presume it to be valid. [Citation.]" (Italics omitted.) Because, unlike the trial court, we find the search warrant was not overbroad it is to some extent unnecessary to address the parties' good faith discussion. Only the first issue above concerns us. For the reasons stated in our discussion of overbreadth, we conclude the magistrate was not misled. Furthermore, as counsel discussed with the trial court, the result would be the same under the doctrine of *Franks* v. *Delaware*, *supra*, 438 U.S. 154.

the affidavit; (3) did not extend to the "D" files under Dr. Hepner's coding system; (4) did not extend beyond "files which originated at the Century City office"; and (5) did not extend to the "years 1984, 1988, or 1989."

b.  *Standard of Review*

■  Review of probable cause supporting a search warrant is a "question . . . of law subject to our independent review [citation]. . . ." (*People* v. *Camarella, supra,* 54 Cal.3d at pp. 601-602.) Moreover, federal constitutional law governs application of the exclusionary rule in light of article I, section 28, subdivision (d) of the California Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 886-887 [210 Cal.Rptr. 631, 694 P.2d 744].)

In *Illinois* v. *Gates* (1983) 462 U.S. 213, 236-237 [76 L.Ed.2d 527, 546-548, 103 S.Ct. 2317], the United States Supreme Court explained ". . . the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. [Citations.]" "This standard of review is 'less probing than de novo review and shows deference to the issuing magistrate's determination.' [Citation.]" (*In re Grand Jury Subpoenas Dated Dec. 10, 1987, supra,* 926 F.2d at p. 856; see also *Illinois* v. *Gates, supra,* 462 U.S. at p. 236 [76 L.Ed.2d at pp. 546-547].) Under the totality of circumstances test set forth in *Illinois* v. *Gates, supra,* 462 U.S. at page 238 [76 L.Ed.2d at page 548], a substantial basis for probable cause will be found if "there is a *fair probability* that contraband . . . will be found in a particular place." (Italics added.)

Noting " '[t]he process does not deal with hard certainties, but with probabilities,' " the court has defined probable cause as "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." (462 U.S. at pp. 231-232 [76 L.Ed.2d at pp. 543-544].) Stronger showings are not required in this context as the court noted: "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, . . . have no place in the magistrate's decision. While an effort to fix some general, numerically precise degree of certainty corresponding to 'probable cause' may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause. [Citations.]" (*Id.* at p. 235 [76 L.Ed.2d at p. 546].)

Finally, we recognize that ". . . a court cannot resort to facts outside the affidavit to determine whether it furnishes such reasonable cause." (*People*

v. *Frank* (1985) 38 Cal.3d 711, 729 [214 Cal.Rptr. 801, 700 P.2d 415].) Therefore, in the first instance, we look at the affidavit to determine whether the material sought is within the scope of the probable cause underlying the search warrant. However, to the extent the court heard evidence and resolved factual issues in the appellant's efforts to traverse the affidavit in support of the search warrant, the trial court's good faith factual findings, " 'whether express or implied, must be upheld if they are supported by substantial evidence.' [Citation.]" (*People* v. *Gallant* (1990) 225 Cal.App.3d 200, 206 [275 Cal.Rptr. 50].) Here, the trial court's finding of overbreadth was based on the affidavit in that the court premised its ruling on the 90 percent figure. The only factual disputes for court resolution came in the hearings challenging Malcolm's good faith on the theory his affidavit contained omissions or misstatements of material facts. The court resolved these factual disputes against appellants.

c. *Probable Cause to Seize All Items of the Particular Type Described in the Search Warrant*

At the outset, we note all parties have relied upon federal cases, specifically those dealing with the "permeated with fraud" approach to overbreadth. Because of the lack of California cases addressing this concept, we also find these cases helpful to our analysis.

As already mentioned, the trial court found the warrant was overbroad, concluding that the 90 percent figures used in the affidavit meant "there was 10 percent of the activity at the medical office that was not of a criminal nature." The court reasoned, "One can analogize to a situation where a neighborhood is reported over and over again being involved, almost every house, in criminal activity, and, therefore, the police would seek a search warrant and search every house in the neighborhood, because most of them or 90 percent of the houses shown in recent times that there was criminal activity involved."

Putting aside the fact that Dr. Hepner clearly controlled his office and its activities, unlike the neighborhood hypothetical where no one person controlled the houses and activities in them, the trial court's analysis ignored the "fair probability" test of *Gates*. Instead, in rejecting the prosecution's "permeated with fraud" approach, the court demanded near certainty. ■ On the contrary, as stated in *United States* v. *Sawyer* (11th Cir. 1986) 799 F.2d 1494, 1508, this "requirement of the Fourth Amendment must be applied with a practical margin of flexibility, taking into account the nature of the items to be seized and the complexity of the case under investigation. The Supreme Court has recognized that a complex criminal investigation may

require piecing together '[l]ike a jigsaw puzzle' a number of items of evidence that may not appear incriminating when taken alone. [Citation.] Moreover, in cases involving a pervasive scheme to defraud, all the business records of the enterprise may properly be seized. [Citations.]" (See also *United States* v. *Kail* (8th Cir. 1986) 804 F.2d 441, 445; *United States* v. *Apker* (8th Cir. 1983) 705 F.2d 293, 299; *United States* v. *Wuagneux* (11th Cir. 1982) 683 F.2d 1343, 1349.)

Particularly persuasive is *United States* v. *Oloyede* (4th Cir. 1992) 982 F.2d 133. There the court rejected an overbreadth attack on a search warrant to search the office of an immigration attorney whose practice consisted of representing Nigerians and Ethiopians in actions before the United States Immigration and Naturalization Service. The affidavit in support of the search warrant detailed (1) over 50 cases in which Nigerian citizens were applying for permanent residence status under section 249 of the Immigration and Nationality Act by using similar documentation and identical employer information; (2) the experience of 2 informants who had been supplied with fraudulent documentation by the attorney and his accomplice in connection with a section 249 immigration application; and (3) a review of 26 files containing false documents for Nigerian aliens whose section 249 applications were handled by the attorney. On appeal, the appellants claimed the warrant was overbroad because probable cause did not extend to (1) non-section 249 matters; (2) the Ethiopian immigration clients; and (3) non-immigration clients. In rejecting this attack, the court of appeals agreed with the government's contention the attorney's business was "permeated with fraud." At the outset, the court noted the attorney's practice "concerned immigration matters to such an extent that non-immigration matters, if any, would be a *de minimis* portion of his activities." (982 F.2d at p. 139.) More significantly, the court of appeals adopted the holding of *United States* v. *Burke* (S.D.N.Y. 1989) 718 F.Supp. 1130, 1140, stating: "It is not necessary that the affidavit supporting the search warrant set forth specific factual evidence demonstrating that every part of the enterprise in question is engaged in fraud. Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are 'just the tip of the iceberg.' That evidence could consist of a large number of fraudulent transactions or of documentation . . . that the entire operation is a scam." (*United States* v. *Oloyede, supra*, 982 F.2d at p. 140.) In so ruling, however, the court emphasized that "where there is probable cause to believe that a business is 'permeated with fraud,' either explicitly stated in the supporting affidavit or implicit from the evidence therein set forth, a warrant may authorize the seizure of all documents relating to the s uspected criminal area but may not authorize the seizure of any severable portion of such documents relating to legitimate activities."

(*Id.* at p. 141.) As will be seen, in the instant case, this severability principle is the parties' main battlefield.

■ As detailed in the statement of facts, Dr. Hepner's fraud was widespread. We only need to mention the highlights of his standard methods of operation for our immediate purposes. This widespread fraud included patients who needed treatment but received unnecessary testing or overtreatment. Orenstein revealed "that all patients that come into the clinic get a complete blood panel whether medically indicated or not." This widespread fraud included a paid referral scheme encompassing patients, attorneys and employees. Moreover, patients without medical problems often either received unnecessary treatment or their files were padded with fictitious charges documented with fraudulent records. The evidence was overwhelming that this was done for the purpose of submitting false claims to the patients and their insurance companies. Finally, the 90 percent estimates clearly established a fair probability that any particular file would contain evidence of this fraud absent some basis for severability.

In related matters, appellants contend the 90 percent estimates were vitiated by Malcolm's failure to incorporate the lower percentage fraud estimates of other employees and to document the Bates 90 percent estimate. As to the Bates matter, the trial court properly resolved this simple credibility question, and substantial evidence supports that decision. As to the lower than 90 percent estimates by other employees, we have reviewed the transcripts of those interviews. There is substantial evidence therein supporting the trial court's finding that the limited perspective of these employees did not undercut the 90 percent estimates of the three witnesses relied on in Malcolm's affidavit in support of the search warrant.

d. *Whether Information Available to Investigator Malcolm Necessitated a More Particular Description of the Property to Be Seized*

All the parties agree, in general terms, that overbreadth also hinges on whether a more precise description was reasonably possible. For example, in *United States* v. *Offices Known as 50 State Distrib.* (9th Cir. 1983) 708 F.2d 1371, 1374, in rejecting an overbreadth challenge to a search warrant for all of a company's records, the court reasoned, "While the seizure was extraordinarily broad, and in that sense 'general', under the particular facts of this case the scope of the warrant was justified. It was not possible through more particular description to segregate those business records that would be evidence of fraud from those that would not, for the reason that there was probable cause to believe that fraud permeated the entire business operation of 50 State."

On the other hand, when the probable cause only relates to a discrete segment of the operation or records such breadth is not justified. In *United States* v. *Bentley* (7th Cir. 1987) 825 F.2d 1104, 1110, the court held: "The description must be as particular as the circumstances reasonably permit. So if the fraud infects only one part of the business, the warrant must be so limited—but within that portion of the business 'all records' may be the most accurate and detailed description possible. [Citations.] . . . . When there is probable cause to seize all, the warrant may be broad because it is unnecessary to distinguish things that may be taken from those that must be left undisturbed. A generic description adequately defines the officers' authority. When the probable cause covers fewer documents in a system of files, the warrant must be more confined and tell the officers how to separate the documents to be seized from others. [Citations.]"

*Center Art Galleries-Hawaii, Inc.* v. *United States* (9th Cir. 1989) 875 F.2d 747 is illustrative in this regard. There, investigators obtained broad search warrants based on probable cause related to 22 instances of fraud involving the sale of forged Salvador Dali artwork. However, the items to be seized were not limited to Dali artwork despite the known fact that only about 20 percent of the company's business was Dali related. The agents executing the warrant hauled away a total of five truckloads of documents, artwork and other property. The court rejected the government's permeated with fraud theory and found no evidence "that evidence of Dali fraud was inseparable from other . . . documents." (*Id.* at p. 751.) We turn to appellants' specific assertions.

### (1) *The Gastroenterological Patients*

Appellants contend because neither the affidavit nor other evidence in Malcolm's possession involved direct evidence of fraud by Dr. Hepner in connection with his gastroenterological patients records relating to them should have been eliminated from the description of property to be seized. We reject this contention.

Circumstantial evidence justified inclusion of these files in the property described by the search warrant. For example, the affidavit reflected that Dr. Hepner's scheme to defraud extended to legitimate patients. The nature of the fraud, bilking insurance companies out of millions of dollars by submission of fraudulent claims for unnecessary or fictitious treatment, although perhaps best suited to "personal injury patients," did not necessarily require a particular type of patient. In addition, he paid referral fees to patients who referred other "patients" to participate in the fraud. Because of the widespread nature of this activity there is no reason believe Dr. Hepner's

gastroenterological patients were not involved in this activity. If so, their files might well evidence such involvement. Moreover, the affidavit reflected that "all patients that come into the clinic get a complete blood panel whether medically indicated or not." Finally, the gastroenterological patients constituted less than one-half of a percent of his business. This is de minimis. (See *United States* v. *Oloyede, supra,* 982 F.2d at pp. 139-140 [showing of immigration fraud involving Nigerian clients of attorney did not require exclusion of Ethiopian and nonimmigration clients' files from description of property]; *Williams* v. *Kunze* (5th Cir. 1986) 806 F.2d 594, 598-599 [fraud involving offshore entities and transaction did not preclude seizure of documents relating to domestic activity]; *United States* v. *Hayes* (9th Cir. 1986) 794 F.2d 1348, 1355-1356 [search warrant based on probable cause founded on 58 instances of controlled substances violations by physician justified seizure of "all controlled substances and all records that related to the procuring, transferring, administering, prescribing, or dispensing of controlled substances" properly covered over 10,000 patient files since "[t]he 58 known cases could fairly be considered as representative of more pervasive violations of the Act."]; *United States* v. *Brien* (1st Cir. 1980) 617 F.2d 299, 309, fn. 11 [fraudulent commodity options sales where, despite the fact that 3 percent of the investors made money on their investments, the court found it was "not a case in which the suspected crime may have been reflected in a segregable class of records. [Citations.]"].)

### (2)  *The 50 to 100 Files of Specifically Named Patients Known to Contain Evidence of Fraud*

Appellants further contend the property described in the search warrant should have been limited to the "list of 50 to 100 files of specifically-named patients known to contain evidence of fraud." We reject this contention out of hand.

This argument likewise ignores the fair probability test. As noted in *United States* v. *Hayes, supra,* 794 F.2d at page 1356, these "known cases could fairly be considered as representative of more pervasive violations." (See also *United States* v. *Hooshmand* (11th Cir. 1991) 931 F.2d 725, 736, fn. 12; *United States* v. *Sawyer, supra,* 799 F.2d at p. 1508 ["Fraudulent conduct in twenty-five separate instances made it probable that SMC sales personnel used identical deceptive and misleading sales techniques with other investors."]; *United States* v. *Brien, supra,* 617 F.2d at p. 308 ["The two hundred fifty complaints that surfaced could fairly be inferred to be only the tip of the iceberg."] Workman, for example, explained the magnitude of the fraud by stating it was like "a McDonald's at noon."

### (3) *The "D" Files Under Dr. Hepner's Coding System*

Appellants next contend the property described in the search warrant should have excluded the files coded "D" because they "would contain *no* fraud. . . ." We similarly reject this contention.

In *Andresen* v. *Maryland, supra,* 427 U.S. at pages 483-484 [49 L.Ed.2d at pages 643-645], the United States Supreme Court dealt with a similar issue. The court held that a search warrant for an attorney's office properly permitted seizure of described documents related to a real estate fraud involving a lot 13T. Appellants complained, however, of the additional seizure of documents relating to another lot. The court rejected this argument by holding: "In *Warden* v. *Hayden,* 387 U.S., at 307, the Court stated that when the police seize ' "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required.' In this case, we conclude that the trained special investigators reasonably could have believed that the evidence specifically dealing with another lot in the Potomac Woods subdivision could be used to show petitioner's intent with respect to the Lot 13T transaction." (427 U.S. at p. 483 [49 L.Ed.2d at p. 644]; see also *United States* v. *Apker, supra,* 705 F.2d at p. 298.)

In the instant case, such a nexus was likewise present. Even accepting appellants' assertion the files coded "D" represented files containing no fraud, they would speak volumes about appellants' intent to defraud. Moreover, such evidence would be powerful corroboration of Malcolm's witnesses, Cunningham and Workman, both of whom had been given immunity.

Finally, we have reviewed the transcripts of the Cunningham and Workman interviews. Cunningham, in speaking of the "D" patients, indicated Dr. Hepner said, "[L]et's put in a lab or something"—meaning, "Put in a lab bill." Dr. Hepner consistently drew blood from the "D" patients as a pretext to run up laboratory bills. Furthermore, even the "D" stickers on the file furthered the fraud because "he could see at a glance what was going on."

Although Workman indicated the "D" patients had to come in for therapy she never stated these people were actually in need of the therapy. In fact, Workman stated, "That was the biggest pain, because I had to call them and practically, I mean beg them to come in sometimes. And I'd have to send them little notes and call them at work and call them at home. [¶] He said, 'Get them in, get them in.' And he would like * * * get them in like this." A reasonable inference is that they did not need therapy but were called in for therapy in order to run up bills.

### (4) *Files Connected to the Satellite Offices*

Appellant also contends the search warrant should have been limited to files originating in the Century City office and should have excluded the files originating in the satellite offices, namely Inglewood, Hollywood and Studio City. Appellants argue this was required because the "practice carried on in those offices was far less than 90% fraudulent." We reject this contention.

In general, this argument ignores the fair probability test. More importantly, however, appellants have focused on the amount of fraud at a particular location of origin, while ignoring the probable cause focus, namely the likelihood that the files in the Century City office contained evidence of fraud. The 90 percent estimates given by Bates, Cunningham and Workman focused on the amount of files containing evidence of fraud. The affidavit indicated the files for all four offices were maintained at the Century City office. In light of the nature of the fraud, which included fictitious entries and padding of bills, the less than 90 percent estimates of fraud at the satellite offices would not have detracted from the showing made in the affidavit. Furthermore, Malcolm testified that "most of the treatment, including the initial and concluding treatment, is Century City, that they received intervening treatment and interim treatment in the satellite offices if they were assigned to that office." (See, e.g., *United States* v. *Falon* (1st Cir. 1992) 959 F.2d 1143, 1147 ["Falon's activities outside the two suites is . . . of little import if pervasiveness of fraud there makes it likely that the itemized records were linked to the charged mail and wire fraud scheme."]; *United States* v. *Brien, supra,* 617 F.2d at p. 309.)

### (5) *Files for 1984, 1988 and 1989*

Finally, appellants contend the description of property in the search warrant should have excluded files for the years 1984, 1988 and 1989 because there was no probable cause to believe the fraud occurred in those years. We reject this contention as well.

The affidavit indicated Williams worked for Dr. Hepner between April 1984 and May 1985. In addition, Van Houten worked there between December 1987 and May 1989. In addition, we note the affidavit and evidence presented to the trial court established Dr. Hepner was engaging in an ongoing scheme to defraud. We conclude the widespread and ongoing nature of this fraud justified the inclusion of such files. "[T]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.

[Citation.] Time factors must be examined in the context of a specific case and the nature of the crime under investigation." (*United States* v. *Koelling* (8th Cir. 1993) 992 F.2d 817, 822.) In *United States* v. *Hooshmand, supra,* 931 F.2d at pages 735-736, involving the search of the office of a physician engaged in submitting fraudulent Medicare claims to the government, the court found probable cause was not vitiated by the fact that ". . . it was eleven months between the time the last employee-informant left Dr. Hooshmand's employ and the issuance of the warrant." The court emphasized: "When the alleged criminal activity is ongoing, however, it is unlikely that the passage of time will dissipate probable cause. [Citation.] The informants, who worked for Dr. Hooshmand from 1977 to 1984, described fraudulent activities allegedly practiced by Dr. Hooshmand throughout this period. This evidence is sufficient to establish the likelihood that the fraud was a part of an ongoing scheme and that the evidence of the fraud was not stale."

Finally, the evidence fails to support appellants' further contention that the ongoing nature of the crime was undercut by evidence relating to the so-called office revolt. It is true that certain employees refused to continue participating in Dr. Hepner's fraudulent scheme. However, it is equally clear the fraud did not cease. For example, Workman explained that after the revolt "[Dr. Hepner] had Cheryl [Spinner] write them in and she had to take them home even with her on the weekend. There [were] big stacks of them. She had to take them home. [¶] . . . [¶] They were just piled up in her—She had this big like thing in her office right beside when you come into it. And they were like piled up, you know, all over her office. And she would—I saw her taking them home with her on the weekends and stuff, big piles of them." Workman also indicated Dr. Hepner became more cautious after this revolt. For example he called in more patients for "therapy"—"not anything beneficial to the patient, just to cover himself."

## 2. *The Patients' Rights to Privacy*

■   Appellants also contend reversal is required because Dr. Hepner's "patients suffered an invasion of the privacy of their confidential medical files which was entirely gratuitous." Appellants premise this assertion on "the right of privacy embodied in the Due Process clause of the United States Constitution and Article I, Section 1 of the California Constitution." We reject this contention also.

### The Right to Privacy Under the California Constitution

Appellants rely on *McKirdy* v. *Superior Court* (1982) 138 Cal.App.3d 12 [188 Cal.Rptr. 143] for their contention the search warrant violated the

patients' rights to privacy under the California Constitution. In *McKirdy*, the court upheld a search warrant for the seizure of records of patients of a psychiatrist involved in Medi-Cal fraud. The court used the following balancing test to resolve the privacy issue: "While the right of privacy is not absolute, it is well established that the propriety of any governmental intrusion upon the right will depend upon a showing that the intrusion was justified by a state need which was compelling not only in the abstract but also when weighed against the privacy rights of the individual and that the scope of the intrusion was no greater than could be justified by the state's need in all the circumstances. [Citations.]" (*Id.* at p. 19.)

However, the *McKirdy* court rejected (1) the need for a special master where not required by Penal Code section 1524, subdivision (c), and (2) the need for any advanced, noticed hearing. That court also held ". . . the magistrate's decision to issue the warrant sufficiently implies a determination that the privacy rights of McKirdy's patients should give way to the limited extent necessary to permit execution of the search warrant. [The affiant's] affidavit provides an adequate basis for that determination." (138 Cal.App.3d at p. 22.)

The court then turned to "the balance between this need and the countervailing interest of McKirdy's patients in the privacy of their records. . . ." (138 Cal.App.3d at p. 22.) The court noted the purposes of the privacy clause, included dealing with the following evils: " '(1) "government snooping" and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records.' " (*Ibid.*) The court found none of these factors present and upheld the search.

Using the *McKirdy* test, we likewise uphold the search in the instant case. Here there was a "predominant state need and sufficiently circumscribed means." (138 Cal.App.3d at p. 20.) Malcolm was investigating a number of crimes and, as we have already concluded, possessed sufficient probable cause to support the scope of the authorized search. The ". . . focused and methodical investigation and the search warrant procedure itself do not evoke the aimless connotation of 'snooping' and were no more secret than practicality requires of any criminal investigation." (*Id.* at p. 23.) Moreover, "[i]n light of the information available to [Malcolm] at the time the search was conducted, the seizures cannot be said to have been overbroad. . . ." (*Ibid.*) Improper use of this information is unlikely because ". . . an officer

seizing and holding property under a search warrant does so on behalf of the court; possession by the officer is, in contemplation of the law, possession by the court. [Citation.]" (*Oziel* v. *Superior Court* (1990) 223 Cal.App.3d 1284, 1292-1293 [273 Cal.Rptr. 196].)

We note that a great number of the "patients" directly participated in the fraud. Even taking into account that a number of patients had some need for treatment, we conclude, as did the *McKirdy* court ". . . the patients' privacy interests are plainly outweighed, in the circumstances before us, by the state's need to investigate and to prosecute a suspected fraud of which the patients themselves, as members of the public and as short-changed recipients of health care services, would be victims." (*McKirdy* v. *Superior Court*, *supra*, 138 Cal.App.3d at p. 23.)

Appellants rely on *In re Search Warrant (Sealed)* (3d Cir. 1987) 810 F.2d 67 for the assertion based on the patients' federal right of privacy. In that case, the government obtained a search warrant to seize patient records of a physician under investigation for insurance fraud, namely double billings to Blue Shield and Medicare for medical tests performed only once. In affirming the denial of appellant's suppression motion, the court adopted a balancing test much like the *McKirdy* test: "The protection afforded by the right to privacy is not absolute. The individual privacy interest in the patients' medical records must be balanced against the legitimate interests of the state in securing the information contained therein. [Citations.]" (*Id.* at pp. 71-72.) The court identified factors to be considered in deciding whether such justification is present include " 'the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access.' [Citation.]" (*Id.* at p. 72.)

These factors are satisfied by the facts underlying the instant case. The types of records within the scope of the search are like those involved in *In re Search Warrant (Sealed)*. Appellants have identified no particular potential for harm from nonconsensual disclosure. The files covered patients for whom Dr. Hepner submitted fraudulent insurance claims—a procedure under which most if not all of the information would or could have been disclosed. As we have already stated, the court maintained ultimate control over this property and could have issued protective orders to prevent improper disclosures if necessary. Finally, the investigation covered criminal matters of great concern to the public and was based on a sufficient probable cause showing.

## CONCLUSION

Based on the parties' stipulation of 135 actual days in custody, the judgment as to Dr. Hepner is modified to reflect a conduct credit of 66 days rather than 67 days. (*People* v. *King* (1992) 3 Cal.App.4th 882, 886 [4 Cal.Rptr.2d 723].) In all other respects, the judgments are affirmed. The petition for a writ of habeas corpus is denied.

Vogel (C. S.), Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied February 4, 1994, and appellants' petition for review by the Supreme Court was denied April 12, 1994.